Argued at Pendleton October 26, affirmed December 21, 1920.

# WILSON v. NORTH POWDER MILLING CO.

(194 Pac. 169.)

**Principal and Agent—Burden of Proving Agency in Satisfaction of a Mortgage Held on Mortgagor.**

1. In action to foreclose a chattel mortgage of crops, defended on ground that mortgage had been satisfied by mortgagor's conveyance of the land on which the crops had been grown to mortgagee by delivery of blank deed to mortgagee's alleged agent, who inserted mortgagee's name as grantee therein, mortgagor had burden of proving that alleged agent in accepting deed and inserting mortgagee's name therein was acting for and as agent of the mortgagee, or that his acts were ratified and approved by mortgagee.

**Deeds—Principal and Agent—Evidence Held not to Prove Agency to Take Deed in Satisfaction of Mortgage, or That Deed was Ratified or Accepted.**

2. In action to foreclose a crop mortgage, where mortgagor claimed that mortgage had been satisfied by conveyance to mortgagee, of land on which crops had been grown, evidence *held* not to prove that third person who received blank deed from mortgagor and inserted mortgagee's name therein was mortgagee's agent, or that mortgagee accepted, ratified or approved the deed.

---

In support of contention that no equitable assignment was effected by the agreement between the chattel mortgagor and the thresherman, see *Young* v. *Shockley*, 80 Kan. 78 (101 Pac. 631); *Boatman's Bank* v. *Fritzlen*, 221 Fed. 145; *Krider* v. *Fannery*, 74 Ill. App. 237; *Rogers* v. *Sturgis*, 152 S. W. 1176; *First Nat. Bank* v. *Ballard*, 41 Okl. 553 (139 Pac. 293); *Crosby* v. *Fresno Fruitgrowers*, 30 Cal. App. 308 (158 Pac. 1070); *German-American Bank* v. *Seattle Grain Co.*, 89 Wash. 376 (154 Pac. 443).

Compromise and Settlement—Purchaser of Mortgaged Crops After Good Faith Settlement With Mortgagee Could not Refuse to Pay Agreed Amount Because of Unfiled Thresherman's Lien Claim Subsequently Presented to Purchaser.

3.   Where purchaser of mortgaged crops made settlement in good faith with mortgagee as to amount due mortgagee and mailed mortgagee a check for the agreed amount, it could not thereafter recall check and refuse to pay such amount by reason of third person's claim for services in threshing the crop, for which no lien had been filed, as required by Section 10230 et seq., Or. L.

Chattel Mortgages—Sale of Crop by Mortgagor—Right to Proceed as Between Warehouseman and Mortgagee.

4.   In a mortgagee's suit to foreclose a chattel mortgage, brought against mortgagor and purchasing warehouseman, to recover for mortgaged growing crop, harvested and delivered to the warehouseman, and by him purchased, in the absence of an agreement on the part of the mortgagee, the chattel mortgage was a prior lien over the charges for sacking, hauling and shipping the grain.

Chattel Mortgages—Sale of Crop by Mortgagor—Rights of Mortgagee as Against Separate Agreement Between Mortgagor and Thresherman.

5.   In a mortgagor's suit to foreclose a chattel mortgage, brought against mortgagor and purchasing warehouseman, to recover for mortgaged growing crops harvested by mortgagor and delivered by him through arrangement with another to the warehouseman, in the absence of agreement on the part of the mortgagee, an intervening thresherman could not be paid his threshing charges by the warehouseman, even though there was an agreement by the mortgagor—grower and the thresherman to the effect that the thresherman should have his money out of the sale of the grain.

From Union: JOHN W. KNOWLES, Judge.

In Banc.

On December 12, 1917, the plaintiff was the owner of 440 acres of land in Union County upon which there was then growing about 200 acres of fall grain which he had sown. On that date he sold the land with the growing crop to defendant John F. Arkell, for the agreed price of $35,500. By the terms of the sale Arkell placed a first mortgage for $18,000 on the real property, with a loan company, and paid this money to plaintiff, to whom he executed two promissory notes, each for the sum of $8,750, payable in one and two years after date. Both of the notes were secured by a second mortgage on the land, the first

of which, payable one year after date, was further secured by a chattel mortgage upon the growing crop "described as all the grain sown and now growing and to be harvested, threshed and marketed during the season of 1918," upon "what is known as the Wilson place on Clover Creek, county of Union, State of Oregon." The mortgage was duly executed and acknowledged, and filed for record in the office of the county clerk on December 18, 1917.

No other grain was sown during the year, 1918. 2,831½ bushels of wheat were threshed from the crop, which was subject to the chattel mortgage and was delivered to the defendant North Powder Milling & Mercantile Company, and by it later sold for $5,381.15. For its services and some incidental expenses the milling company made a charge of $520.01, leaving net proceeds of $4,861.14. After conference, plaintiff approved such charges and expenses, and agreed that they should be deducted from the gross amount, and the milling company mailed him a check for the balance. The defendant Laughlin was the owner of a machine, and threshed the grain at an agreed price of $800. Although there was an agreement between Arkell and the milling company that Laughlin should be paid out of the proceeds of the grain, there is no evidence that the plaintiff was a party to that agreement, or that he ever approved it. During the time that the check was in transit in the mail from North Powder to La Grande, Laughlin saw the milling company and wanted his money, which it refused to pay, but it did countermand the mailed letter inclosing the check, and later refused to deliver the same to the plaintiff. The latter then brought the instant suit to foreclose his chattel mortgage, and to obtain a decree against the Arkells for

the full amount of the note with attorney's fees, and against the milling company for the amount of the mailed check, which, when received, should be applied *pro tanto* on the decree against the Arkells. Laughlin was made a defendant because of his claim for the threshing of the grain.

An answer was filed by Arkell and his wife, in which they admit the execution of the note and mortgage, and as a further and separate defense allege that on October 28, 1918, plaintiff employed H. T. Hill as his agent to procure the legal title from the Arkells to the 440 acres of land; that pursuant to such employment, and as agent of the plaintiff, Hill procured from Arkell an agreement in writing, giving him the exclusive right to sell the lands, for $1,000, the purchaser to assume "all indebtedness against said land and crop." On October 29th, Hill notified the Arkells that he had found such purchaser, and on that day paid them $500, and on the following day the further sum of $500. The Arkells then executed a quitclaim deed to the premises, with the name of the grantee in blank. Later, Hill inserted the name of the plaintiff as such grantee, and filed the deed for record in the office of the county clerk on November 4, 1918. It is then alleged:

"That the said Henry T. Hill, in accepting delivery of said quitclaim deed to said 440 acres of land from said defendants, in inserting the name of the plaintiff as grantee therein, in filing the said deed for record, and in paying these defendants the said $1,000, the purchase price therefor, was acting as the agent of the plaintiff duly authorized thereto," and that "these defendants thereby fully paid and satisfied said two promissory notes for the sum of $8,750 each, including the promissory note set out and alleged in the complaint in this suit for part of the purchase price of said lands."

As a further and separate answer, they allege that Laughlin threshed the grain and had an agreement that he should be paid out of the proceeds of the sale. They pray for a decree that each of the notes should be surrendered and canceled; that the mortgages executed to secure those two notes should be satisfied of record; that Arkell is the owner of the balance of the money received from the sale of the grain and that he recover the further sum of $900, as damages from the plaintiff.

In its answer the milling company alleges that there was a dispute as to who should have the money, and that it was a stakeholder and deposited $4,739.54, in court, claiming it was entitled to deduct $642.61 as its charges. In his answer, Laughlin pleads cutting and threshing the grain at an agreed price of $800, and that he had an agreement with Arkell and the milling company that it was to be paid out of the sale of the grain, and he asks for a decree to that effect.

Plaintiff filed a reply to each further and separate answer, in which all the material allegations were denied. Testimony was taken, and the Circuit Court rendered a decree for plaintiff as prayed for in his complaint, including $750 as attorney's fees, from which defendants appeal.    AFFIRMED.

For appellants there was a brief over the name of *Messrs. Crawford & Eakin,* with an oral argument by *Mr. Thomas H. Crawford.*

For respondent there was a brief over the name of *Messrs. Cochran & Eberhard,* with oral arguments by *Mr. George T. Cochran* and *Mr. Colon R. Eberhard.*

JOHNS, J.—1. The execution of the notes and mortgages being admitted, the important question here is whether, in obtaining the deed in blank from the Arkells and inserting the name of the plaintiff as grantee therein, Hill was acting for and as the agent of the plaintiff, and whether his acts were ratified and approved by plaintiff. The quitclaim deed executed October 29, 1918, recites that it conveys the premises "subject to all indebtedness against the land." It is claimed that the acceptance of the deed by Wilson operated to satisfy the Arkell mortgage and extinguish their debt. As to those questions, the burden of proof was upon the Arkells.

On October 28, 1918, Arkell, who then held the record title, gave to H. T. Hill a three-day option to purchase the land, on condition that "the purchaser assume all indebtedness against the land and crop," and that he should pay $500 down and $500 in ten days. Under this option Hill interested Rodger Ricks and Ezra W. Ricks, known as "Ricks Brothers," and they advanced the first $500, later paying the other $500. On October 29th, at the instance of Hill, Arkell and his wife for such consideration executed a quitclaim deed to the land, in which the name of the grantee was left blank. Hill testified as follows, regarding this feature:

"Q. Now what arrangement, if any, did you have with them in regard to inserting the name of the purchaser?

"A. I told Arkell at that time, that I didn't know how that deed was going to go, to both of these boys or one of them, and I didn't know their first names, and I didn't know just where the deed was going to go, and I wanted the deed made in blank, and fill it in afterwards.

"Q. And he assented to that?

"A. Yes. * *

"Q. Now, then, did you afterwards insert in the deed the name of the purchaser?

"A. Some time afterwards I inserted in the name, yes. I don't know just how long it was afterwards, some few days though. * * I put Mr. Wilson's name in the deed. * * I recorded it. * *

"Q. You still have the deed?

"A. I think I have. * *

"Q. And did you tell Mr. Wilson that you would put his name in the deed and put it on record?

"A. Well, I think some little time afterwards, I met Mr. Wilson on the street, and I told him I was afraid somebody might attach the land, and I had part of the boys' money, and for the protection of all of them, I put his name in the deed and filed it."

Later, Hill drew a contract between Ricks Brothers and the plaintiff, which was signed by the former, but never signed by the plaintiff. Concerning this agreement Hill testified:

"Yes; he said he didn't want to sign a contract until the matter was finally settled, and Arkell would give possession and everything, and he knew just exactly where he was, and I think he said there was some jangle in regard to the crop or something, and he didn't want to sign a contract until everything was settled, and he had perfect authority to sign one, and then he said he would have Cochran look over it or something like that, when he got ready."

After he inserted the name of Wilson as grantee in the deed, Hill took that instrument to the county clerk's office and filed it for record. After it was recorded it was returned to him. He further testified:

"Q. Now in those conversations, what, if any, arrangement or agreement was made between you and him, whereby you were employed by him to obtain from Arkell the legal title to this land?

"A. I don't know whether I was ever employed to secure that title for Wilson or not. Wilson said if

Arkell would get out of the road, and these young
fellows were good workers, he would be willing to
give them a chance. That was about the substance
of the conversation.''

2. It also appears that Arkell had some pressing
creditors, and Hill became uneasy, thinking they
might make trouble; that he deemed it advisable to
put the property in the name of Wilson to facilitate
the deal and avoid complications. It is apparent that
it was the original intention of both Arkell and Hill
that the deed should be made to Ricks Brothers; that
they were the intending purchasers; that they fur-
nished the $1,000; that the only reason why the deed
was not made out to them when it was executed was
because Hill ''didn't know their first names''; that
it was for such reason Arkell assented to executing
the deed with the name of the grantee in blank. In
other words, at the time the deed was executed, it
was the purpose of both Hill and Arkell that the land
should be conveyed to Ricks Brothers, and it was to
such a conveyance that Arkell gave his consent and
authorized Hill to insert their names as grantees.
Hill does not claim or testify that in the procuring
and execution of the deed he was acting for the plain-
tiff. The record shows that at that time he was rep-
resenting Ricks Brothers, and that he inserted plain-
tiff's name as grantee on his own motion, without the
knowledge of either Arkell or the plaintiff. The
plaintiff testifies fully and in detail that Hill was
never his agent, and was never authorized to repre-
sent him; that the plaintiff had nothing to do with
procuring the deed and never saw it; that he never
authorized Hill to insert his name as grantee therein;
that the first time he knew that this had been done
was when Hill told him about it, after the deed had
been filed for record; and that he never accepted, ap-

proved, or ratified that instrument. The testimony is conclusive that Hill was not at any time the plaintiff's agent, and that the latter's name was inserted in the deed without his consent; that he never accepted, ratified, or approved the deed.

3. It appears that after a conference between the plaintiff and the defendant milling company there was an agreement, in effect, "that the expenses connected with the sacking of said wheat and the making of said sale amounted to $520.01," which should be deducted from the proceeds of the sale of the grain; and that the company should pay the plaintiff the balance of $4,861.41. Pursuant to that agreement, the company prepared and mailed from North Powder a check for that amount to the plaintiff, and while the check was in transit Laughlin claimed his bill of $800 for threshing the grain, as a result of which the milling company recalled the check. In other words, if Laughlin had not appeared and pressed his claim for payment when he did, the plaintiff would have received the check and the milling company would have paid him the full amount agreed upon in their mutual settlement.

4. The company now claims that the sacking, hauling and shipping charges totaled $642.61, which amount should be deducted from the proceeds of the sale of the wheat. In the absence of an agreement on his part to pay, it might be questioned whether all of such charges would be a prior claim on the grain, as against plaintiff's chattel mortgage. Having made a settlement in good faith, the milling company should be bound by it, especially where it was acted upon by one party and relied upon by the other, and is fair and reasonable.

5. Sections 10,230 et seq., Or. L., provide for a thresher's lien and that—

"The lien hereby created shall have priority over all other encumbrances or liens upon such grain, save and except only the lien of laborers for labor performed in heading, harvesting and threshing said crop."

There is no claim that any such lien was filed by Laughlin. At the time the grain was threshed the chattel mortgage was in full force and effect, and was a valid lien upon the grain. Although there was an agreement between Arkell and Laughlin to the effect that the latter should have his money out of the sale of the grain, there is no evidence that the plaintiff was ever a party to that agreement, or that he is bound by it.

The decree of the Circuit Court is affirmed.

AFFIRMED.