Argued at Pendleton May 9, reversed and remanded July 17,
rehearing denied September 25, 1923.·

HILL *v.* WILSON.

(216 Pac. 751.)

**Pleading—Discretionary to Permit Amendment of Complaint to
Conform to Proof After Parties Rested.**

1. After the parties in an action for services had rested, it was
not error for the court, in the exercise of its discretion, to permit
plaintiff to amend his complaint to conform to his proof, when
defendant was not harmed thereby.

**Brokers—Complaint Need not Allege Fictitious Promise to Pay for
Services—Promise Being Implied.**

2. When one person renders valuable services for the benefit
and with the knowledge and consent of another, the complaint need
not allege a fictitious promise to pay; a promise being implied.

**Brokers—Allegation That Plaintiff Performed Certain Services for
Defendant for an Agreed Price Held Sufficient Allegation of
Promise to Pay Therefor.**

3. A complaint alleging performance of services in the sale
of defendant's property sufficiently showed that the services were
beneficial, and a further allegation that "said sum of $3,500 was
and is the reasonable and agreed price to be paid for such
services" was equivalent to an allegation of a direct promise to
pay.

**Brokers—Evidence of Services in Securing Loan not Admissible
Under Allegation for Services in Sale of Real Property—"In."**

4. Where a complaint alleged that defendants were indebted to
plaintiff for services performed "in the sale of certain lands
belonging to defendant," evidence that plaintiff procured a loan
to permit the sale, which had previously been agreed upon, to be
consummated, was not admissible, since the allegation could only
be understood to mean services rendered in bringing about a
sale and not in securing a loan, and since the word "in," when
used as a preposition, expresses the relation of presence, existence,
situation, inclusion, action, etc., within the limits as place, time,
condition, circumstances, etc.

**Pleading—Complaint Should be Clear and Unequivocal.**

5. The complaint should be clear and unequivocal, so as to apprise the opposing party of what is intended to be proved at the trial.

**Brokers—Oral Contract to Procure Loan on Commission for Purchase of Realty not Contract to Employ Agent to Sell Realty, and Therefore not Invalid.**

6. A contract by a real estate broker to procure a loan for the purchase of real estate is not a contract for the employment of an agent to sell real estate, and is therefore not invalid because not in writing, under Section 808, subdivision 8, Or. L., providing that an oral agreement employing a broker to sell real property on commission shall be void.

**Brokers—Oral Contract Necessarily Involving Sale of Realty by Broker on Commission Held Invalid.**

7. An oral contract by the vendor of real estate with a broker, agreeing to compensate the broker to get rid of the vendee in possession, who had title, leaving the broker to his own devices as to the method, which necessarily involved a sale of the land by the agent, was void under Section 808, subdivision 8, Or. L., providing that an oral agreement employing a broker to sell real property on commission shall be void.

From Union: J. W. KNOWLES, Judge.

In Banc.

Henry T. Hill sued E. O. Wilson and George T. Cochran for the value of services alleged to have been rendered and for money claimed to have been loaned. The plaintiff was nonsuited as to Cochran. The contest was and is between Hill and Wilson only. Cochran is therefore eliminated as a party. The jury found for the plaintiff and against Wilson in the sum of $3,500. Wilson appealed from the consequent judgment.

The second amended complaint contains two causes of action and it reads as follows:

7. Necessity that agent's authority to purchase or sell real property be in writing to enable him to recover compensation for his services, see notes in 13 Ann. Cas. 977; Ann. Cas. 1915A, 1133; 44 L. R. A. 601; 9 L. R. A. (N. S.) 933.

Validity of statute requiring written contract for commission for sale of realty, see note in Ann. Cas. 1913C, 727.

"1. That during all the times hereinafter mentioned the plaintiff was and still is a duly licensed broker, loan and real estate agent at La Grande, Union County, Oregon.

"2. That between the 1st day of January, 1918, and November 1st, 1919, the defendants became and were indebted to plaintiff in the full sum of $3,500 for services, work and labor then and there done and performed to and for them by plaintiff, in the sales of certain lands belonging to defendant E. O. Wilson, situated in Union County, Oregon, to one John F. Arkell and afterwards to Ricks Brothers, and the crops thereon, approximately of the value and amount of $40,000 together with services in the trial of a case in the Circuit Court of the State of Oregon for Union County, respecting the rights of the parties by one Arkell against defendant E. O. Wilson, and that said sum of $3,500 was and is the reasonable and agreed price to be paid for said services by the defendants to plaintiff. That said sum is now due and wholly unpaid from defendants to plaintiff, except the sum of $1,568.35 paid thereon, about April 14th, 1919, which plaintiff has allowed as a credit.

"And for a further and second cause of action the plaintiff alleges:

"1. That on or about April 14th, 1919, the plaintiff at the special instance and request of defendants, loaned them the full sum of $1,568.35, to be repaid by them, within six months thereafter, but which sum defendants failed and refused to so repay plaintiff, and the same is still due and unpaid from defendants to plaintiff, although frequently demanded, together with interest thereon at the rate of 6% per annum."

Then follows a prayer for a judgment for $3,500 with interest at the statutory rate from April 14, 1919.

A demurrer by Wilson separately attacking the two causes of action was overruled. Wilson then answered by admitting the first paragraph of the complaint and denying all the other allegations. The

answer also contains an affirmative defense to the effect that the plaintiff and Wilson had settled all matters and that Wilson had paid in full all debts owing from him. The plaintiff in his reply traversed the affirmative allegations of the answer.

REVERSED AND REMANDED. REHEARING DENIED.

For appellant there was a brief over the name of *Messrs. Cochran & Eberhard,* with oral arguments by *Mr. George T. Cochran* and *Mr. Colon R. Eberhard.*

For respondent there was a brief over the names of *Mr. C. H. Finn* and *Mr. H. E. Dixon,* with an oral argument by *Mr. Finn.*

HARRIS, J.—It will be impossible to understand the points urged by Wilson unless the discussion is prefaced by a statement of some of the admitted facts and a somewhat detailed account of the story told by the plaintiff and his witnesses and a brief recital of the story told by Wilson. And it may be here explained that Hill's and Wilson's recitals of most of the conversations are so different one from the other that as to each conversation the recital of one is literally antipodal to the other.

Hill maintained an office in La Grande; and he was the local agent of the Amstel Mortgage Company of Spokane. Wilson owned 760 acres in Union County in what is known as the Clover Creek country; and this land was encumbered by a purchase-money mortgage which amounted to about $27,000 and was held by the Eaton Estate.

Wilson placed the lands in the hands of J. F. Phy, a real estate dealer, to sell. At some time in 1917 Wilson gave to one Watkins a bond for a deed for 320 acres of the land. In the latter part of 1917,

probably in October, negotiations were begun looking towards the purchase of the remaining 440 acres by John F. Arkell who, Wilson says, was introduced to him by "a man by the name of Schonemaker of Pendleton" who acted in conjunction with Phy. These negotiations terminated in a sale to Arkell. Arrangements were made through Hill whereby the Amstel Mortgage Company was to loan $18,000 on the 440 acres and out of this money the Eaton Estate was to be paid all but $12,000 due on the Eaton mortgage. The unpaid balance of $12,000 was to be secured by a mortgage on the Watkins 320 acres. When these arrangements were perfected Mrs. Eaton changed her mind and concluded that "she wanted all, or else have the mortgage stand as it was." Hill then arranged with the Amstel Mortgage Company for a loan of $12,000 on the 320 acres. The total amount loaned by the mortgage company was $30,000. The application for the twelve thousand dollar loan was signed by Wilson; but the application for the eighteen thousand dollar loan was signed "John F. Arkell by Wilson." However, Arkell signed the notes and mortgage to the Amstel Mortgage Company. The price agreed to be paid by Arkell was about $35,000. A first mortgage on the 440 acres secured the $18,000 loaned by the Amstel Mortgage Company. Arkell paid $500 in cash and on December 12, 1917, gave to Wilson two promissory notes, each for $8,750, one payable on or before one year after date and the other payable on or before two years after date. Both notes were secured by a second mortgage on the land. As additional security for the note due one year after date Arkell gave to Wilson a chattel mortgage covering "all the grain sown and now growing

108 Or.—40

and to be harvested, threshed and marketed during the season of 1918'' on the 440 acres. Arkell took possession of the premises. The $500 paid by Arkell was received by Phy as part payment of his commission as real estate broker. Hill does not claim that he acted as a real estate broker or that he participated as such broker in selling the property to Arkell. Indeed, Hill testified:

''I wasn't employed to sell land. The land was already sold before he [Wilson] came to me to negotiate the loans. He [Wilson] had agreed to give him [Arkell] an abstract of title, and it was impossible for him to fill the contract.''

Hill claims that his services rendered in securing the two loans were rendered at the request of Wilson and were for him. Wilson insists that Arkell desired to buy but did not have sufficient funds and that Hill rendered his services at the request of and for Arkell in order to enable Arkell to buy the land.

According to Hill the practice usually followed was for the borrower to pay Hill's Commission, ''the recording of the mortgage, the revenue stamps and the abstracting''; after the company received and approved the title it sent the funds to Hill directing him ''what things to pay off'' so as to make the mortgage a first lien; and the custom was for Hill to hold his ''commission out of the funds.'' Hill says that $600, or 2 per cent on $30,000, the total amount loaned, is a reasonable sum for his commission in procuring the loans. However, in this instance after Hill paid the Eaton mortgage, recorded the Arkell mortgage, furnished stamps and paid other expenses, he found that he had paid out $23 more than the amount received from the mortgage company ''in order to clean up the indebtedness''; and ''so there was no money to pay me at the time my commissions.''

On October 28, 1918, Hill obtained from Arkell an "option" appointing him, Hill, the exclusive agent to sell "my 440 acres of land, the purchaser to assume all indebtedness against the land and crop." The price fixed in the option was $1,000. As a result of this "option" Rudger Ricks and Ezra W. Ricks, brothers, paid to Arkell $1,000 and immediately, or about October 30, 1918, took possession of the 440 acres. Hill says that Arkell and Wilson had just harvested a crop and were quarreling. Hill claims that Wilson came to him and told him what he would do if Hill could get Arkell off the place and "get possession of the crop." In other words, according to the plaintiff, Wilson was anxious to get rid of Arkell and to obtain possession of the crop. Hill says that Wilson said: "If I could get that crop, and get the place back, anything above $2,000 for the crop I could have." Wilson denies that any such talk occurred. Hill insists that, acting on the offer made by Wilson, he procured the "option" and persuaded the Ricks brothers to "buy Arkell off." It is claimed by Hill that he and the Ricks brothers and Wilson talked over the deal before the Ricks brothers paid any money to Arkell, and that it was understood that the Ricks brothers "were to have a contract on the place," under the terms of which one half of the crop each year was to be delivered to Wilson "as payment on the land." Hill testified that the Ricks brothers did not have any money to buy seed wheat and that Wilson, who had agreed to furnish seed wheat for the summer-fallow, requested him to furnish and that he did furnish seed wheat to the amount of $360.

Hill says that in November, 1918, he and Wilson "settled up what was due me—the different amounts, and agreed on the amount between us"; and he

claims that $3,500 was the amount so agreed upon. Hill does not fix the exact date; but if there was a settlement at all it was prior to the hereinafter mentioned occasion when it is said, the $3,500 note signed by the Ricks brothers was turned over to Hill as a pledge for the payment of the $3,500 alleged to be due from Wilson to Hill.

A suit to foreclose the chattel mortgage was begun by Wilson on November 11, 1918. This mortgage, it will be remembered, covered the crop which was harvested by Arkell in 1918. The grain when threshed was delivered to the North Powder Milling & Mercantile Company, a corporation, and by it sold; and so when Wilson brought suit to foreclose the chattel mortgage he made the corporation and Arkell and his wife parties defendant. The corporation answered by declaring that it had sold the crop for a specific sum, that it was entitled to retain a certain amount for expenses and charges, and that it was a stakeholder and for that reason brought the remainder of the proceeds into court and asked that H. W. Laughlin, who had threshed the crop and was claiming $800 for it, be required to intervene. Arkell defended by pleading the acceptance by Wilson of a quitclaim deed signed by Arkell and wife and purporting to convey the 440 acres to Wilson. It was argued by Arkell that the deed canceled the notes and mortgage and left him the owner of the crop and its proceeds. However, it was determined at the trial that the deed had been executed by the Arkells and delivered by them to Hill with the understanding that the names of the two Ricks brothers would be inserted as grantees; and it was also decided that the instrument, though recorded at the instance of Hill, had been recorded without the consent of Wilson and that it had not been accepted

by Wilson. In the instant case the complaint speaks
of a case "by one Arkell against defendant E. O. Wil-
son." There is no record of a case bearing that title.
The case which Hill intended to describe in his com-
plaint is the suit brought by Wilson to foreclose the
chattel mortgage. The suit prosecuted by Wilson for
the foreclosure of the chattel mortgage terminated on
April 29, 1920, in the Circuit Court in a decree fore-
closing the chattel mortgage and awarding to Wilson
the whole amount derived from the sale of the grain
after paying the corporation its lawful charges. The
decree was affirmed by this court in an opinion ren-
dered December 21, 1920; *Wilson* v. *North Powder
Milling Co.,* 98 Or. 364 (194 Pac. 169). After the
affirmance of the decree the sum of $4,738 was paid to
Wilson who, after satisfying certain debts incurred
in the litigation, had $3,913.14 as the remainder.

Under date of November 6, 1918, Hill prepared a
contract and three promissory notes, one of which was
for $3,500 payable one year from date, another for
$6,500 payable two years from date, and a third note
for $7,000 payable three years from date. Rudger
Ricks and Ezra W. Ricks signed the contract and the
notes about the time of the date borne by them.
Under the terms of the contract the Ricks brothers
agreed to pay the three notes and to assume and pay
the eighteen thousand dollar mortgage held by the
Amstel Mortgage Company. Thus it is seen that
$35,000 was the price ultimately to be paid by the
Ricks brothers for the 440 acres of land. Apparently
the $1,000 paid to Arkell was to compensate him for
the summer-fallowing work done by him and for what-
ever crop he may have sowed. This contract provided
that the Ricks brothers should each year deliver one
half of the crop to Wilson to be applied on the notes

in the order in which they were to become due. If the payments were made within the times specified, it was agreed by Wilson to deliver a deed conveying the premises to the Ricks brothers. A conference, if it occurred at all, occurred at some time after the commencement of the suit to foreclose the mortgage; and at that conference Hill, Rudger Ricks and Wilson were present. According to Hill it was stated by Wilson that the latter could not sign the contract with the Ricks brothers until the lawsuit with Arkell was settled; and so the contract and notes were placed in Hill's hands, it is claimed, to be kept by him with the understanding of all concerned that Wilson would sign the contract when the litigation with Arkell was ended. It is the contention of Hill that it was understood by all that he should hold the thirty-five hundred dollar note as a pledge for the payment of the $3,500 claimed to have been settled upon as the amount due him from Wilson; and it is further asserted by Hill that Wilson instructed Rudger Hicks that they (Ricks brothers) "were to pay Mr. Hill the first note." The theory of Hill was that Wilson was expecting to pay him out of the Arkell crop proceeds, but since those moneys were in litigation, Wilson was without funds and was unable to pay Hill, and for that reason it was understood that payments on the first Ricks note should go to Hill unless Hill should sooner and otherwise be paid the amount said to be due from Wilson.

Taxes on the 440 acres were not paid; and interest on the Amstel Mortgage Company mortgage, which should have been paid by Arkell, was overdue; and the company was pressing for payment. In this situation, Wilson early in April, 1919, importuned the Ricks brothers to make a payment. The first Ricks note was not due. The Ricks brothers were under no obligation to pay the taxes then due nor to pay the

overdue interest. Eventually, however, on April 14, 1919, the Ricks brothers borrowed from a bank $1,700 on a note which Wilson also signed. The Ricks brothers secured the bank by giving a mortgage on their crop then growing on the 440 acres. A part of the moneys so borrowed was used by the Ricks brothers to pay for seed wheat. Immediately after borrowing the $1,700, Rudger Ricks, acting for Ricks brothers, drew a check for $1,568.35, the aggregate amount of the taxes due on the 440 acres and the interest due on the Amstel Mortgage Company mortgage, payable to the order of Hill, and delivered the check to Hill. The check was converted into a certificate of deposit by Hill and that instrument was by him forwarded to the mortgage company. Rudger Ricks understood that the check was to apply as a payment on the thirty-five hundred dollar note held by Hill; and Hill says that he accepted the check and credited the amount of it on the thirty-five hundred dollar debt alleged to be due on the settlement made with Wilson. In other words, the theory of the plaintiff is that the check was applied on the Ricks note and that he, Hill, as pledgee of the note and pursuant to the agreement with Wilson and Ricks brothers, received the money as part payment of Wilson's debt. The plaintiff insists that at the time of the delivery of the check it was expressly agreed that if he would agree not to keep the check for himself and would permit the amount of it to be applied on the Amstel Mortgage Company mortgage he should be repaid out of the moneys collected from the foreclosure suit. Hill did not receive any of the moneys derived from that litigation. It must be remembered that Hill says that he claimed an interest in the crop which was growing in April, 1919, because he had furnished the

seed for the crop and held the thirty-five hundred dollar Ricks brothers' note which by the terms of the alleged contract of November 6, 1918, signed by Ricks brothers but not signed by Wilson, was to be paid by one half of the crop raised; and Hill further says that since the crop was mortgaged to the bank for the borrowed money and his own security thus impaired he was unwilling for the check to leave his hands unless assured that he would be repaid. The plaintiff insists that the $1,568.35 was paid to him as his money pursuant to the original instructions concerning the pledge of the thirty-five hundred dollar Ricks note, and that he then loaned the amount to Wilson by sending the certificate of deposit to the mortgage company. Wilson says that he not only refused to sign the Ricks brothers contract but also that he did not agree that he would at any time sign it; and he further contends that the check was given to Hill because the latter was the agent of the mortgage company and that the check was intended as a payment on the mortgage held by the company and did not involve a loan to Wilson.

The Ricks brothers harvested the 1919 crop and in the fall of that year they sowed wheat on 80 acres that they had summer-fallowed. At some time after sowing this fall wheat the Ricks brothers sold their interests to one Sims. The Ricks brothers remained in possession until they sold to Sims and he took possession immediately after purchasing from Ricks brothers. Sims gave to Ricks brothers a mortgage on the crop which the latter had sown on the 80 acres in the fall of 1919; and the Ricks brothers transferred this mortgage to Hill. The crop froze and it became necessary to reseed the 80 acres. Both Hill and Wilson had an interest in the crop which had been frozen; and so on May 17, 1920, Hill and Wilson signed a writ-

ing whereby they agreed to sow the 80 acres to barley, to harvest and sell the crop, and to share equally in the expenses and in the proceeds to be derived from the sale of the crop to be sowed and harvested. This agreement was carried out and is the basis of Wilson's plea of settlement and full payment.

Hill claims that because of Wilson's alleged promise to pay him out of the proceeds to be derived from the foreclosure suit he had an interest in the subject matter of that suit; and he says that the services rendered by him in that suit consisted of keeping out of the litigation as a party in conformity with the direction of Wilson's attorney, and ''just giving what information I had in regard to the matter.'' Hill was subpoenaed and testified as a witness for the contesting defendants, Arkell and Laughlin, in the foreclosure suit; and Wilson and his attorney say that Hill neither gave them information nor assisted them in any manner in that suit, and it is denied by Wilson that Hill was directed or requested not to become a party to the foreclosure suit.

1. After both parties rested the court permitted the plaintiff to amend his complaint by striking from the second paragraph in the first cause of action the words and figures ''1st day of January, 1918,'' and substituting ''on or about the 1st day of December, 1917,'' so as to make the complaint allege that the services were rendered between December 1, 1917, and November 1, 1919. We are told that the amendment was made. The amendment, if made, conformed with the plaintiff's evidence; it did not harm Wilson; and the ruling of the court was a fair and reasonable exercise of judicial discretion.

The court at a time when Wilson's first witness was testifying suggested that ''it may be necessary to

amend your complaint * * to show services rendered in the case of *Wilson* v. *North Powder Milling & Mercantile Company.*'' The plaintiff requested and he was granted permission by the court to make the amendment. There is nothing in the record to indicate that the amendment was made; but we shall go on the assumption that it was actually made. Wilson was in nowise misled by the allegation in the complaint nor could he have been surprised by the amendment if it was made. Soon after the beginning of the trial, if not before, Wilson was made aware of the fact that the proceeding attempted to be described in the complaint was the foreclosure suit. Viewed in the light of the attending circumstances the ruling of the court was not error.

2. It is argued that the complaint is insufficient because it does not allege that Wilson requested the services or that he promised to pay for them. Formerly it was necessary sometimes to employ the fiction of a promise; but now under the Code practice the facts out of which a cause of action arose may be stated and from certain facts the law will imply a promise: *Waite* v. *Willis,* 42 Or. 288, 289 (70 Pac. 1034); *Keene* v. *Eldriedge,* 47 Or. 179, 183 (82 Pac. 803). A promise to pay may be implied from the fact that one requested another to render services: *Pioneer Hardware Co.* v. *Farrin,* 55 Or. 590, 593 (107 Pac. 456); see, also, *Johnston* v. *Fitzhugh,* 91 Or. 247 (178 Pac. 230); and a request may sometimes be inferred from the beneficial nature of the consideration and the circumstances attending the transaction: *Kiser* v. *Holladay,* 29 Or. 338, 344 (45 Pac. 759); *Joseph* v. *Johnson,* 7 Penne. (Del.) 468 (82 Atl. 30). The complaint does not directly allege a request and it may be assumed that the pleading does not narrate enough circumstances to permit the implication of a request;

and therefore the complaint is vulnerable to demurrer if the allegation of a request is essential in every case. It is not always necessary, however, to allege a request.

The rule stated, in general terms, is that when one person renders valuable services for the benefit and with the knowledge and consent of another, a promise to pay is implied: *Sargent* v. *Foland,* 104 Or. 296, 305 (207 Pac. 349); but the implication of such a promise may be overcome by an understanding that the service was to be without compensation; and furthermore such an understanding may be implied from the circumstances: *Kiser* v. *Holladay,* 29 Or. 338, 344 (45 Pac. 759); *Joseph* v. *Johnson,* 7 Penne. (Del.) 468 (82 Atl. 30).

3. Of course a voluntary act of courtesy, though of benefit to the person for whom it was done, will not make him liable to pay the doer of the act; but if a person requests the performance of a service he is liable for the service when rendered; and a person may likewise be liable if after he knows of the performance of beneficial service he promises to pay for it: *Glenn* v. *Savage,* 14 Or. 567, 577 (13 Pac. 442); *Forbis* v. *Inman,* 23 Or. 68, 72 (31 Pac. 204); *Kiser* v. *Holladay,* 29 Or. 338, 343 (45 Pac. 759); *Meyer* v. *Livesley,* 56 Or. 383, 387 (107 Pac. 476, 108 Pac. 121); *Parker* v. *Daly,* 58 Or. 564, 571 (114 Pac. 926, 115 Pac. 723, 34 L. R. A. (N. S.) 545). The complaint sufficiently shows that the alleged services were beneficial to Wilson; and consequently if the complaint contained a direct allegation that Wilson promised to pay, the pleading would be sufficient. The word "promise" is not employed in the complaint, but the use of that word is not indispensable. The complaint does aver "that said sum of $3,500 was and is the

reasonable and agreed price to be paid for said services by the defendant to plaintiff''; and this averment is equivalent to the direct allegation of a promise: 5 C. J. 1394. The complaint is not vulnerable to demurrer on any of the grounds thus far discussed.

4. Wilson contends that evidence relating to the loans made by the Amstel Mortgage Company was a prejudicial variance from the complaint. If we again notice the complaint we observe that the plaintiff sues for (1) services rendered; and (2) money loaned. The services alleged to have been rendered are described as services performed (a) in the sale of land to John F. Arkell; (b) in the sale of the same land to Ricks brothers; and (c) in the trial of a certain case. The defendant Wilson argues that the complaint must be construed to mean that the plaintiff rendered services as a real estate broker and the defendant Wilson further says that he entered the courtroom ''expecting to meet the question of services in making sales of real estate,'' and he therefore contends that all the evidence about securing a loan of $12,000 on the Watkins 320 acres and a loan of $18,000 on the Arkell 440 acres was inadmissible under the allegations of the complaint. Hill does not claim that he was employed as a broker to effect a sale; and, although in one of his answers when a witness he spoke of having sold the land, it is clear from his testimony taken as a whole that he does not claim to have rendered any service in making a sale to Arkell. The plaintiff says that the language in the complaint was used to mean that he rendered services in accomplishing acts which were merely incidental to the sales.

5. The averments in a complaint ought to be clear and unequivocal so as to apprise the opposing party

of what is intended to be proved at the trial. A pleader ought not to be permitted to employ language fairly open to different constructions and then to take his choice between them: 31 Cyc. 72. The word "in" when used as a preposition expresses:

"The relation of presence, existence, situation, inclusion, action, etc., within the limits, as of place, time, condition, circumstances, etc." Century Dict.; 22 Cyc. 35.

A stranger to the record upon reading the complaint without any knowledge of the evidence would at once understand that the plaintiff meant that he rendered services in bringing about the sales. Indeed, the very first paragraph of the complaint advises that Hill is a duly licensed real estate agent. It is true that perhaps a foreclosure of the Eaton mortgage was imminent, and that procuring the loans avoided such foreclosure and thus any disturbance of Arkell was prevented; but it is also true that Hill was employed, not to render a service in a sale to Arkell, but to render a service in a loan to Arkell. Indeed, according to Hill's own testimony, the sale had already been made when Wilson came to him to negotiate the loan, and the title was evidently in the name of Arkell because the application for the loan was made out in the name of Arkell and the Amstel Mortgage Company note and mortgage were signed by Arkell and his wife; and hence the sale having been already made and consummated the service could not have been rendered in a sale to Arkell, whether the complaint be construed as contended for by the plaintiff or as contended for by Wilson. The word "service" has many times been given a very broad meaning because of correspondingly broad descriptive language used in connection

with it: *Meyer* v. *Livesley,* 56 Or. 383, 388 (107 Pac.
476, 108 Pac. 121); but we think that in the instant
case the plaintiff should have alleged the rendition
of services in procuring a loan instead of the rendi-
tion of services in a sale to Arkell, and that evidence
of procuring the loan to Arkell in the circumstances
already related ought not to have been permitted
under the present allegations of the complaint. The
plaintiff ought in plain language to inform the de-
fendant of the facts which he intends to prove by
evidence.

6, 7. The services rendered in securing a loan to
Arkell on the 440 acres and a loan on the Watkins
320 acres did not come within Section 808, subdivi-
sion 8, Or. L., which declares that an agreement
"authorizing or employing an agent or broker to
sell or purchase real estate for a compensation or
commission" is void unless in writing. But ob-
viously if in 1918 when Wilson wished to get rid of
Arkell, Hill was specifically authorized or employed
by Wilson to purchase for Wilson or for Ricks
brothers, or if Hill was specifically employed by
Wilson to effect a sale to Ricks brothers, then in
either event Hill is precluded from recovering for
such service, for the reason that the agreement is
not evidenced by a writing: See *Sherman* v. *Clear
View Orchard Co.,* 74 Or. 240, 246 (145 Pac. 264).
But if it be supposed that Hill was employed to get
rid of Arkell and to obtain for Wilson the wheat
crop which had already been harvested with the
understanding that Hill was left to his own devices
and resources in accomplishing the desired result,
then a more difficult question is presented, because
in bringing about the desired result a sale to Ricks
brothers occurred. As we have already stated the
title to the land, it appears, was in Arkell. If we

are correct in this understanding, then an employment to get rid of Arkell necessarily and inevitably involved a sale by him, and if a sale was so involved the employment was within the statute, because in the final analysis the employment was to sell real estate.

Although the complaint contains an averment that Wilson agreed to pay the specified sum which is alleged to be reasonable, and notwithstanding the fact that because of this condition of the pleading it might with some show of reason be argued that the complaint is ambiguous (*West* v. *Eley*, 39 Or. 461, 465 [65 Pac. 798]), the cause was tried on the theory that the plaintiff was suing for the reasonable value of his services. There was evidence that the real value of the services rendered in procuring a loan was 2 per cent of the amount of the loan, and it also appeared that Hill paid out of his own pocket $23 for recording, stamps and an abstract. In an action to recover for services rendered in procuring the loans Hill of course would be entitled to include as part of his demand the sum of $23. Evidence of the alleged settlement was received under the general rule that where work had been completed and nothing remains to be done except to pay for the services rendered, evidence of the express contract fixing the price may be offered as evidence of the reasonable value. The settlement alleged to have been made with Wilson included the commission for the loan, the expenses paid by Hill, the wheat furnished by Hill to Ricks brothers, and the services rendered in a sale of the land to Ricks brothers. In Hill's own language the settlement was "for all those different transactions that was performed." Even though it be assumed that the plaintiff in this action could recover for services rendered in the sale to

Ricks brothers he would not be entitled, in the attending circumstances, to include as "services" the value of the wheat furnished by Hill to Ricks brothers. The jury returned a verdict for the full amount of the alleged settlement.

A plain, concise and unambiguous statement of the facts requires a complaint informing the defendant that he is being sued for services rendered in procuring a loan, particularly since on the plaintiff's own showing the sale had already been made when Wilson asked Hill to negotiate for a loan. The services rendered in securing a loan were not rendered in or within, or during, or in the progress of a sale; they were rendered after a sale.

The conclusion to be drawn from the record is that Arkell owned the land subject to encumbrances. Hill was the procuring cause of the transfer to Ricks brothers. The complaint avers that Hill rendered services in a sale to Ricks brothers; and it is literally true, if the plaintiff's evidence is believed, that the services rendered by Hill consisted of bringing about a purchase from Arkell and a sale to Ricks brothers. If such was the situation the plaintiff cannot in the absence of a writing recover for those services.

The judgment is reversed and the cause is remanded.

REVERSED AND REMANDED.    REHEARING DENIED.